UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | **FILED UNDER SEAL** |
| | ) | |
| v. | ) | Civil No. |
| | ) | |
| 5 REAL PROPERTIES and 40 | ) | |
| ACCOUNTS AND INVESTMENTS, | ) | |
| | ) | |
| Defendants. | ) | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

The United States of America, by its attorney, Andrew E. Lelling, United States Attorney for

the District of Massachusetts, in a civil action of forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and

981(a)(1)(C), alleges, upon information and belief, that:

## I.    NATURE OF THE ACTION

1.    This action is brought by the United States of America seeking forfeiture of all right,

title and interest in the defendant 5 real properties and 40 accounts and investments, as further described

in *Exhibit A* attached hereto (collectively, the "Defendant Properties").  Except as otherwise noted in

*Exhibit A*, The Defendant Properties are located in the District of Massachusetts.  Attached as *Exhibit*

*B* are photographs depicting the 5 defendant real properties.

2.    The Defendant Properties are property, real or personal, which constitute or are

derived from proceeds of the following violations:  18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C.

§ 1349 (Conspiracy to Commit Health Care Fraud), 18 U.S.C. § 371 (Conspiracy to Defraud the

United States (Related to a Healthcare Benefit Program)), and 42 U.S.C. § 1320a-7b(b)(2) (Offer and

Payment of Kickbacks).  Each of these offenses is a "Federal healthcare offense," pursuant to 18

U.S.C. § 24(a).  In addition, each of these offenses is a "specified unlawful activity" because each is

"any act or activity constituting an offense involving a Federal health care offense."  *See* 18 U.S.C.

§ 1956(c)(7)(F).

3.     The Defendant Properties are also property, real or personal, involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering), and 18 U.S.C. § 1957 (Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity), and any property traceable to such property.

4.     The Defendant Properties are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C),) as "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to a violation of … any offense constituting 'specified unlawful activity'" and/or, pursuant to 18 U.S.C. § 981(a)(1)(A) as "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 or 1957], or any property traceable to such property."

## II.     JURISDICTION AND VENUE

5.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

6.     Venue is proper under 28 U.S.C. § 1395.

## III.     FACTUAL BACKGROUND

7.     As described in more detail below, there is probable cause that Arbor Homecare Services LLC ("Arbor") and others, including one of its founders Faith Newton ("Newton"), defrauded government healthcare benefits programs of at least $100 million by failing to train staff, paying illegal kickbacks, billing for home health services that were never provided or were not medically necessary, and billing for home health services that were not authorized.

8.     The proceeds of this fraud scheme were used to purchase real properties, deposited into bank accounts and other investments, used to fund the lifestyles of Faith Newton and others, and otherwise laundered and dissipated.

## A.     THE CRIMINAL PROSECUTION

9.     On January 28, 2021, a grand jury in the District of Massachusetts returned a 15-count indictment against Newton and Winnie Waruru ("Waruru").[1]  Specifically, the grand jury found probable cause for the following violations:  Conspiracy to Commit Health Care Fraud, in violation of 18 U.S.C. § 1349 (Count One), Health Care Fraud, in violation of 18 U.S.C. § 1347 (Count Two), Conspiracy to Pay and Receive Kickbacks, in violation of 18 U.S.C. § 371 (Count Three), False Statements, in violation of 18 U.S.C. § 1001(a)(2) (Counts Four and Five), False Statements in Health Care Matter, in violation of 18 U.S.C. § 1035(a), Conspiracy to Launder Monetary Instruments, in violation of 18 U.S.C. § 1956(h) (Count Seven), and Laundering of Monetary Instruments, in violation of 18 U.S.C. § 1957 (Counts Eight through Fifteen).  A copy of the indictment (the "Indictment") is attached hereto as _Exhibit C_.[2]

10.     The Indictment included Forfeiture Allegations providing notice of the United States' intent to forfeit assets that were the proceeds of, or property involved in, the charged offenses.  _See Exhibit C_.  For assets specifically identified in the Forfeiture Allegations, the grand jury found probable case that the assets were proceeds of, or property involved in, the commission of the charged offenses.

11.     This civil _in rem_ forfeiture complaint names as defendant properties all of the assets identified in the Forfeiture Allegations of the Indictment, and further names additional assets that the United States alleges are subject to forfeiture, including assets held in the name of individuals, trusts, or corporate entities not charged in the Indictment.

12.     In general, assets may be subject to civil forfeiture, criminal forfeiture, or both.

---

[1] Waruru was charged in Counts One through Six.  Newton was charged in Counts One through Three, and Seven through Fifteen.

[2] At the time of this filing, the Grand Jury returned the Indictment to the District Court, Under Seal, but the Indictment has not yet been docketed.  The United States will replace Exhibit C with the docketed Indictment.

B.        **OVERVIEW OF MEDICARE, MEDICAID, AND MASSHEALTH**

13.        The Medicare program ("Medicare") is a federal health care program that provides benefits to persons who are over the age of 65 or disabled.  Medicaid is a federal and state-funded health insurance program for children, families, and individuals who fall below certain income levels, or are disabled.  The Commonwealth of Massachusetts' Medicaid program is commonly known as "MassHealth."  Medicare and MassHealth are both a "health care benefit program" as defined by 18 U.S.C. § 24(b).

14.        Home health agencies, like Arbor, must first be certified to participate in the Medicare program before becoming a Medicaid provider in Massachusetts.  Once Medicare approves a home health agency, the agency can file a MassHealth enrollment application to become a Medicaid provider.

15.        Both Medicare and MassHealth pay for medically necessary home health services.  Medicare and MassHealth authorize payment for home health care only for care actually provided that was medically necessary (*i.e.*, the services were required because of disease, disability, infirmity, or impairment).  Medicare and MassHealth do not cover services and treatment that were not actually provided, or for which the patient did not meet the criteria necessary to justify the claimed service or treatment.

16.        Home health services are generally defined as services provided to a patient at his/her place of residence, pursuant to his/her physician's orders as part of a written plan of care that the physician reviews every 60 days.  Home health agencies typically provide three types of in-home care: nursing services; home health aide services; and therapy (physical, speech, occupational).

17.        To receive home health services, the home health care provider must conduct a comprehensive assessment of each patient to determine the patient's eligibility for home health

care and the level of skilled care required to adequately care for the patient.  During that assessment, the home health care provider is required to gather clinical data, known as an Outcome and Assessment Information Set ("OASIS").  Such data is typically gathered by a nurse in a face-to-face visit with the patient and is recorded on a standard OASIS form.

18.     To certify that services are medically necessary, a physician must sign a Form CMS-485, Home Health Certification and Plan of Care ("Plan of Care").  The Plan of Care describes the nature and frequency of the services to be provided to the patient, and the type of professional who must provide the services.  MassHealth home health agencies, like all MassHealth providers, must comply with MassHealth's Administrative and Billing Regulations set forth at 130 Code Mass. Regs. § 450 (2020).

## C.     OVERVIEW OF THE FRAUD SCHEME

### *Arbor Formed by Newton and her Husband and Certified for Medicare and MassHealth*

19.     Corporate records from the Secretary of the Commonwealth of Massachusetts state that Arbor was formed on January 20, 2012, and list Newton as a corporate officer.[3]

20.     Arbor was founded as a home health nursing agency by Newton and her husband Benjamin Muiruri ("Muiruri").

21.     Newton is a registered nurse who has worked in the home health care industry beginning in at least 2002.

22.     Arbor sought certification for the Medicare Program, which the Centers for Medicare and Medicaid Services ("CMS") approved on January 23, 2013.  Arbor's MassHealth enrollment application was approved on August 7, 2013.

---

[3] Newton was removed from the corporate records by amendment in 2014.

23.     As described in more detail below, from August of 2013 to January of 2017, Arbor received more than $162 million from MassHealth's Medicaid program (which is funded 50 percent by federal funds), and approximately $350,000 from the Medicare program.

24.     Arbor submitted claims for reimbursement to Medicare and/or Medicaid until approximately January 2017, at which point MassHealth suspended all payments to the company based on what MassHealth determined were credible allegations of fraud.

25.     Newton ran Arbor from its inception until it was closed in 2017.

### *Arbor Paid Illegal Kickbacks for Patient Referrals*

26.     Arbor paid illegal kickbacks in the form of $100 bonuses for patient referrals.

27.     One particularly active patient recruiter was Recruiter 1.  Newton paid Recruiter 1 $100 per patient recruited to Arbor.  Newton and Recruiter 1 talked about the kickback scheme in a series of text messages.

28.     On December 31, 2013, Recruiter 1 texted Newton about her referral bonus:

> Hi dear [Newton] is me [Recruiter 1] when is a good time t see u tomorr to talk about business?  I have more referrals.  However, I like to sign a contrac for the bonus ….

Newton responded:

> I can see you tomorrow anytime after 10am will be in the office and I have your bonus for patient you refered so you can pick it up tomorrow.

29.     On January 20, 2014, Recruiter 1 texted Newton again:

> I like to up date me of every case I refer please.  It to slow.  We need to sit down bcs I can get u more numbers but until then I will stop.  I care u.  have business but everybody needs to make a profit too.  Business is. Business beside friendshipping.

30.     On June 24, 2014, Recruiter 1 and Newton met at a McDonalds restaurant and Recruiter 1 sent the following:

6

> I am leaving now I need to see around ur office in a
> confortable place.  I dont need noone to see @ ur office.
> Are not in ur office I like to see u
> in the donking donuts on bridge st.  What u think? ….
> Ok I am parked in the MCDNALS acros from popyes.

Newton responded, "Ok I'm coming…I'm here in black car[.]"

31.    In September 2014, Recruiter 1 tried to negotiate additional kickbacks for

bringing former patients back to Arbor:

> If one client was with ur comp then discharged fr x reason I will
> get back with doct's recomm.  Do u pay to reclut her?  She will go
> back as new client or I let her go with elder service.

Newton responded "[w]e pay for admission not a recert."

### *Arbor Hired Patient Family Members to Provide Home Health Assistance that Was Unauthorized, Not Medically Necessary, or Never Occurred*

32.    Arbor, through Newton and others, developed employment relationships as way

to pay kickbacks for patient referrals, regardless of medical necessity requirements.  Arbor,

through Newton and others, entered sham employment relationships with patients' family

members to provide home health aide ("HHA") services that were not medically necessary;

routinely billing for fictitious visits that Newton knew did not occur.

33.    According to Recruiter 1, many of Arbor's patients did not actually want skilled

nursing visits but signed up to receive skilled nursing services from Arbor so that their family

member could be paid as an HHA.  Newton was aware, facilitated, and actively participated in

this fraud scheme to pay kickbacks to patients and their family members in exchange for the

ability to bill Medicare and MassHealth for home health services in excess of $100 million in

HHA claims alone.

34.    Special Agents interviewed numerous patients of Arbor who reported being

independent in their activities of daily living (ADLs), meaning that they were able to manage

their own bathing, dressing, grooming, and cooking.  These patients reported that Arbor, nonetheless, hired their family members to provide HHA services to them for ADLs.  Many of these patients also reported receiving substantially fewer nursing visits than what Arbor billed MassHealth.

35.     After Arbor was shut down by MassHealth, nurses from another home health agency assessed several of Arbor's former patients to determine if the patients required services.

36.     Special Agents interviewed several nurses from the new home health agency who reported that many of the patients did not require any services.  Those patients that were assessed by Arbor as requiring a modest amount of skilled nursing visits were often assessed by the new agency as *not* requiring HHA services at all.

37.     Nurses at the new agency also said that many patients demanded extraordinary amounts of HHA hours for family members upon meeting the nurses before any assessment could even be performed.

38.     In addition, several former Arbor patients refused to be admitted to the new agency.  The nurses at the new agency were told by the patients that the patients would find an agency that would hire their family member as an HHA, like Arbor did.  For example, one nurse reported that when he tried to schedule an assessment with a patient, the nurse was told "[d]on't even try to screw up my services.  We are all going together to another agency, I need my 6 hours."

### *Arbor Failed to Provide HHAs Required Training and Assessed Patients for More Services than Needed*

39.     Arbor hired Recruiter 1 as an HHA.  Recruiter 1 was interviewed and reported that she never underwent the required training to become an HHA.  In fact, Recruiter 1 reported that she only attended a new employee orientation where she was handed the answer key to the HHA training exams.

40.     Former Employees 2, 3, 4 and 5, who were also hired by Arbor as HHAs similarly reported that Arbor never provided its HHAs the 75 hours of training and certification mandated by Medicare and MassHealth.  Instead Arbor gave newly hired HHAs the answers to the required tests and/or made inaccurate documentation in their personnel files if any documentation was missing.  Newton's signature appears on many of the sham HHA certificates, and other training documents.

41.     Newton personally performed the assessments of Arbor's 10 initial patients as part of Medicare's accreditation process.  A review of those patient records revealed that Newton initially assessed these patients as needing very little care.  Pursuant to Newton's assessment the patients' nursing visits and HHA hours were nominal; typically, requiring 1 to 3 nursing visits a week, HHA hours were usually 1 to 2 hours a day, a few times a week.  Although some of these patients were quickly discharged, others continued services for years.

42.     Once Arbor was accredited by Medicare and thereafter enrolled as a MassHealth provider, billing increased exponentially.  On several occasions, Newton discharged and readmitted the same patient within days.  Newton increased the nursing visits to those same patients to daily, or twice daily.

43.     Special Agents interviewed a former Arbor employee, Former Employee 2, who reported that Newton told her Newton always assessed patients as needing two nursing visits a day because Arbor could make more money that way.

44.     Of the former patient interviews conducted by law enforcement, nearly all reported receiving less nursing visits than claimed, and billed, by Arbor.

45.     Newton manipulated patient OASIS assessments to make it appear as if patients required home health services when they did not.  She enrolled, and caused to be enrolled, patients who never needed services, or only accepted the services to supplement their income by

kickbacks or payments to family members hired as HHAs.  Newton ignored patient complaints received by her employees and directed the office staff not to document those complaints in Arbor's electronic medical records

### *Arbor Paid Illegal Kickbacks to Patients*

46.     One of the nurses who routinely billed for twice daily nursing visits was Waruru, who was charged with Newton in the Indictment.  *See Exhibit C*.

47.     Waruru is a Licensed Practical Nurse who was employed at Arbor from 2014 until its closure in January 2017.

48.     Several of Waruru's patients were interviewed by law enforcement and they all reported that Waruru visited them once or twice a week.

49.     Waruru, however, routinely billed for either daily or twice daily visits for these same patients.  Waruru also created fake nursing notes to conceal her actions.

50.     In addition, Waruru aided the kickback scheme by paying kickbacks to patients on behalf of Newton.  Specifically, Waruru was interviewed by Agents and admitted that Newton payed kickbacks to patients to recruit them as part of Arbor's initial Medicare certification.

51.     Thereafter, Newton continued to pay kickbacks to some of those patients by giving envelopes of cash to Waruru to deliver to those patients.  Waruru, in turn, billed for twice daily nursing visits to these patients and was paid $28 a visit (whether real or manufactured) by Arbor.  From 2014 to 2016 Arbor paid Waruru approximately $450,000, while Waruru was, allegedly, at the same time working for other home health agencies.

52.     Newton and Waruru exchanged text messages regarding the payment of kickbacks to certain patients, and in addition, Newton exchanged text messages regarding kickbacks with a patient's girlfriend.

53.     After Arbor shut down operations, Newton acquired a pre-existing home care agency called Golden Living.  Claims analysis revealed that several former patients of Arbor, known to have been paid kickbacks, became patients of the new company.

54.     Newton either directly or through Arbor appeared to target patients who were low-income, on disability, and/or suffering from depression and/or addiction.  As a home health nurse with over a decade of experience, Newton was able to not only abuse the system, but did so by manipulating a vulnerable patient population.

### D.     <u>RECEIPT OF FRAUD PROCEEDS</u>

55.     From approximately January 1, 2014 through January 31, 2017, Arbor was paid more than $162 million for medical reimbursements from MassHealth.  The individual payment amounts from MassHealth to Arbor, several each month, ranged from approximately $320,797.82 in early 2014 to more than $1.7 million in November 2016.  During that time, Newton and Muiruri paid themselves approximately $40 million from Arbor.

56.     Reimbursement from MassHealth was paid at different rates based on the type of service provided to a patient and the skill level of the care giver.  Payments were primarily broken out by skilled care which included nursing services provided by medically licensed nurses, and physical and occupational therapy provided by licensed care givers, and non-skilled care provided by HHAs, who were trained and certified, but not licensed medically.

57.     Arbor typically billed MassHealth using five procedure and service codes;

    a.     G0156 - SERV HME HLTH AIDE IN HME HLTH SETNG EA

    b.     G0299 - HHS/HOSPICE OF RN EA 15 MIN

    c.     G0152 - SERV OCCUP THERAPY IN HME HLTH SETNG EA

    d.     G0151 - SERV PHYS THERAPIST IN HOME HLTH SETNG; and

    e.     G0300 - HHS/HOSPICE OF LPN EA 15 MIN.

11

58.     While probable cause exists to believe that Arbor's fraud involved all of the types of care Arbor purported to provide, by far the largest area of fraud was with the HHA care, typically using Code G0156.  Probable cause exists to believe that all of the reimbursements to Arbor for HHA services purportedly rendered during this time period were obtained using fraudulent representations including representation regarding training of staff, level of care required, and level of care provided.

59.     Based upon Arbor's fraudulent representations, all payments made by MassHealth for Code G0156 to Arbor constitute proceeds of specified unlawful activity (*i.e.*, Health Care Fraud).

60.     Between approximately January 1, 2014 and January 2017 payments attributable to reimbursement for purported HHA care from MassHealth to Arbor exceeded $99 million, and comprised the majority of the reimbursements from MassHealth to Arbor during this time period (more than 60% of MassHealth reimbursements were for purported HHA care).

## E.     DISTRIBUTION OF FRAUD PROCEEDS

61.     During its operation, and up through at least October 2017, Arbor maintained three bank accounts at Bank of America, which included

    a.   a payroll account 004638037700 (the "7700 Account"),

    b.   an operating account 004638037768 (the "7768 Account"), and

    c.   a savings account 004638385931 (the "5931 Account"),

(collectively, the "Arbor BOA Accounts").

62.     Newton and her husband Muiruri were both listed as signors on all three accounts.

63.     MassHealth payments were primarily deposited into the 7768 Account.

64.     Money was transferred from the 7768 Account to the 7700 Account to cover payroll as needed.

65.     Between January 1, 2014 and October 24, 2017 (when the Arbor BOA Accounts were closed), there were regular transfers among all three of the Arbor BOA Accounts, including large transfers into the 5931 account.  The only deposits into the 5931 Account were transfers from the 7768 and 7700 Accounts and interest accrued.

66.     While operational, Arbor paid Newton and Muiruri bi-weekly payroll.  From approximately January 2014 through February 2017 Newton and Muiruri each received payroll income in excess of $800,000.

67.     During this same period, additional payments were made from Arbor to Newton and Muiruri, or for their benefit, from the Arbor BOA Accounts.  These payments were primarily to personal bank accounts controlled by Newton, Muiruri, or members of their family.  Payments were also made directly from Arbor BOA Accounts to purchase assets for Newton, Muiruri, or members of their family.  From approximately 2014 until Arbor closed in 2017, the majority of Newton and Muiruri's income came from Arbor.

68.     Since 2014 Newton and Muiruri maintained bank accounts in their name or under their control at multiple banks and credit unions, including Digital Federal Credit Union, Jeanne D'Arc Credit Union, Align Credit Union, Lowell Five Cent Savings Bank, Discover Bank, Santander Bank, Enterprise Bank, Northern Bank and Trust Company, Citizens Bank and Bank of America.

69.     These accounts were used to hold or transfer fraud proceeds, although most of the funds paid to Newton and Muiruri from the Arbor BOA Accounts went to accounts at Bank of America that Newton and Muiruri controlled.  Newton maintained two accounts at Bank of America, a checking account 000016539723 (the "9723 Account") and a savings account 000116539723 (the "9723 Savings Account").  Muiruri maintained two accounts at Bank of

America, a checking account 000035026118 (the "6118 Account") and a savings account 000135026118 (the "6118 Savings Account"). These accounts have since been closed.

70. Newton received approximately $21,614,173, directly and indirectly, from Arbor during the period January 2014 through October 2017. Each payment listed below originated in one of the three Arbor BOA Accounts and each transaction contained at least $10,000 of fraud proceeds (numbers are rounded to the closest dollar):

| Date | Source Arbor BOA Account | Paid to | Amount | Destination Asset or Account |
|---|---|---|---|---|
| 12/31/2013 | 5931 | Faith Newton | $335,000 | 9723 Account |
| 03/07/2014 | 5931 | Faith Newton | $150,000 | 9723 Account |
| 03/24/2014 | 5931 | Faith Newton | $186,000 | 9723 Account |
| 04/21/2014 | 7768 | Faith Newton | $500,000 | 9723 Account |
| 04/21/2014 | 5931 | Faith Newton | $50,000 | 9723 Account |
| 06/10/2014 | 5931 | Careplus[4] | $75,000 | Careplus 0076 Account |
| 06/10/2014 | 5931 | Careplus | $25,000 | Careplus 0063 Account |
| 08/13/2014 | 5931 | Dow Law Group | $1,301,701 | 2 Woolsack Drive |
| 01/20/2015 | 7700 | Faith Newton | $500,000 | 9723 Account |
| 02/23/2015 | 7768 | Faith Newton | $30,000 | 9723 Account |
| 04/06/2015 | 5931 | Faith Newton | $565,000 | 9723 Account |
| 04/23/2015 | 5931 | Faith Newton | $2,500,000 | 9723 Account |
| 06/22/2015 | 7768 | Robert Wyman Esq | $121,761 | 3 Courthouse Ln, Unit 12 |
| 08/31/2015 | 7768 | Attorney John K Leslie | $90,200 | 3 Courthouse Ln, Unit 4 |
| 09/02/2015 | 7768 | Robert Wyman Esq | $254,509 | 1 Courthouse, Unit 13&15 |
| 10/29/2015 | 7768 | Careplus | $1,000,000 | Careplus 0063 Account |
| 11/09/2015 | 7768 | Faith Newton | $100,000 | 9723 Account |
| 12/14/2015 | 7700 | Faith Newton | $500,000 | 9723 Account |
| 12/31/2015 | 5931 | Robert Wyman Esq | $350,000 | 31 Westford St, Lowell |

---

[4] On or about July 16, 2014, Newton organized Careplus Medical Transport LLC. Newton is listed as the sole Managing Member.

| Date | Source Arbor BOA Account | Paid to | Amount | Destination Asset or Account |
|---|---|---|---|---|
| 12/31/2015 | 7768 | Newton Minor Child 1 | $50,000 | Align Credit Union |
| 12/31/2015 | 7768 | Newton Minor Child 2 | $50,000 | Align Credit Union |
| 03/14/2016 | 7768 | Faith Newton | $1,300,000 | 9723 Account |
| 03/31/2016 | 7768 | Faith Newton | $100,000 | 9723 Account |
| 05/16/2016 | 7768 | Faith Newton | $3,500,000 | 9723 Account |
| 09/15/2016 | 7768 | Faith Newton | $2,000,000 | 9723 Account |
| 10/26/2016 | 5931 | Faith Newton | $2,100,000 | 9723 Account |
| 01/10/2017 | 7700 | Faith Newton | $500,000 | 9723 Account |
| 01/12/2017 | 7700 | Faith Newton | $2,000,000 | 9723 Account |
| 01/17/2017 | 7768 | DC Development & Construction | $100,000 | Work on 440 Great Pond |
| 03/02/2017 | 5931 | Faith Newton | $280,000 | 9723 Account |
| 07/06/2017 | 5931 | Faith Newton | $1,000,000 | 9723 Account |
| | | **Total:** | **$21,614,173** | |

71.     During the period that Arbor operated, and afterwards, Muiruri also received large payments from Arbor either directly paid to his accounts at Bank of America, the 6118 Account or the 6118 Savings Account, or to third party accounts.  During his ownership of the two accounts at Bank of America Muiruri transferred funds regularly between the accounts and kept a balance in his Personal BOA 6118 Savings Account in excess of $1,000,000 between April 23, 2015 and March 26, 2018.

72.     In total, Muiruri received approximately $9,192,877 from Arbor during the period January 2014 through the closure of the Arbor BOA Accounts in October 2017:

| Date | Arbor BOA Account | Amount Paid |
|---|---|---|
| 03/07/2014 | 5931 | $150,000 |
| 05/21/2014 | 5931 | $100,000 |

| Date | Arbor BOA Account | Amount Paid |
|---|---|---|
| 09/23/2014 | 5931 | $200,000 |
| 12/15/2014 | 5931 | $100,000 |
| 01/20/2015 | 7700 | $500,000 |
| 04/06/2015 | 5931 | $500,000 |
| 04/23/2015 | 5931 | $2,500,000 |
| 12/14/2015 | 7700 | $500,000 |
| 06/01/2016 | 7768 | $2,000,000 |
| 01/12/2017 | 7700 | $2,000,000 |
| 09/01/2017 | 7768 | $642,877 |
| | Total: | $9,192,877 |

73.     Muiruri used the funds he received to make investments, open other bank accounts and purchase real estate.  Muiruri also used trusts to purchase and hold assets.

### F.     FORFEITABILITY OF EACH DEFENDANT ASSET

74.     As described in greater detail below, the fraud proceeds obtained by Arbor into its Arbor BOA Accounts were then transferred to multiple bank accounts, investments, and used to purchase other assets.  Accordingly, each of these accounts, investments, and assets is property, real or personal, which constitutes or is derived from proceeds traceable to the fraud, and is also property involved in a money laundering violation.

#### a.  Real Property Located at 2 Woolsack Drive, Westford, Massachusetts 01886

75.     On or about August 11, 2014, Newton purchased the real property located at 2 Woolsack Drive in Westford for $1,612,500.  The purchase of this real property involved more than $10,000 of fraud proceeds.

76.     In or around April 2014 Newton paid $322,500 as a deposit on the property to Coldwell Banker with two checks paid from her personal BOA Account 9723.

16

77.     Between July 14, 2014 and August 11, 2014 Arbor received approximately $1,669,673.70 in payments from MassHealth for HHA services (i.e., fraud proceeds) into Arbor BOA Account 7768.  During that same time period approximately $900,000 was transferred from Arbor BOA Account 7768 to Arbor BOA Account 5931.

78.     On or around August 13, 2014, Newton withdrew $1,301,701.78 from Arbor BOA Account 5931 and purchased a cashier's check, number 1652502359, payable to the Dow Law Group.   The Dow Law Group is the law firm that handled the closing of the property purchase.  Upon purchase, in August 2014, the property was deeded to Newton.

79.     On or about March 4, 2015, Newton transferred the property through a Quitclaim Deed to the Newton Family Revocable Trust for consideration of $1.  According to the Quitclaim Deed, Newton and Muiruri are the Trustees for the Newton Family Revocable Trust.

### b.  Real Property located at 440 Great Pond Road, North Andover, Massachusetts, 01845

80.     On or about October 3, 2016, Newton and Muiruri completed the purchase of 440 Great Pond Road in North Andover for $2,000,000.  The purchase of this real property involved more than $10,000 in fraud proceeds.

81.     On or about May 16, 2016, $3,500,000 was paid from Arbor BOA Account 7768 to Newton's personal BOA Account 9723.  At least 60% of the $3.5 million constituted fraud proceeds (i.e., HHA reimbursement from MassHealth).  Then, on or about May 26, 2016 Newton made two transfers from her Personal BOA 9723 checking account to her Personal BOA 9723 savings account, of $2,000,000 and $1,000,000 respectively.  These transfers involved fraud proceeds.  Between May 26, 2016 and October 3, 2016, the balance in Newton's personal BOA 9723 savings account was never below $4,000,000.

82.     On or about September 1, 2016, the Manor Realty Trust was created and two individuals, Lucy C.  Munyi and Samuel G.  Kimungu, were appointed trustees.  Based on subsequent changes, Newton became the sole beneficiary of the Manor Realty Trust.

83.     On or about October 3, 2016, $2,012.177.82 was wired from Newton's personal BOA 9723 savings account to her attorney.  This wire transfer included more than $10,000 of fraud proceeds and the wire payment was payment of the purchase price for this Defendant Property, including closing costs.

### c.   Real Property located at 12 Mountain View Drive, Dracut, Massachusetts 01826

84.     On or about August 20, 2018, Newton completed the purchase of 12 Mountain View Drive in Dracut, Massachusetts for $337,610.  The purchase of this real property involved more than $10,000 in fraud proceeds.

85.     In sum, Arbor received fraud proceeds (MassHealth reimbursement for HHA services), transferred a portion of those fraud proceeds to Muiruri, who then moved those proceeds from account to account and sent them to Newton, who used those proceeds to purchase 12 Mountain View Drive.

86.     Between approximately April 18, 2016 and May 31, 2016, Arbor received payments from MassHealth into the Arbor BOA 7768 Account, which included fraud proceeds of at least $6,162,244.

87.     On or about June 1, 2016, $2,000,000 was wired from Arbor BOA Account 7768 to Muiruri's BOA Account 6118.  On that same date $2,000,000 was transferred from Muiruri's BOA Account 6118 Account to the Muiruri's BOA Savings Account 6118.  Each of these transfers included more than $10,000 in fraud proceeds.  Between June 1, 2016 and March 26, 2018, the balance of Muiruri's BOA 6118 Savings Account never dropped below $1,400,000.

88.     On or about March 26, 2018, Muiruri opened two bank accounts at Northern Bank and Trust Company, a Money Market Account 6527860700 (the "Defendant 0700 Account") and Checking Account 7689065100 (the "5100 Account") (each described in Section mm below).

89.     On or about March 26, 2018, Muiruri transferred $1,961,058.35 from Muiruri's BOA Savings Account 6118 to Muiruri's BOA Checking Account 6118.  The following day, $1,950,000 was paid from Muiruri's BOA Checking Account 6118 to Muiruri's Defendant 0700 Account.  This transfer included in excess of $10,000 of fraud proceeds.

90.     In and around August 6 and 7, 2018, $600,000 was transferred from Muiruri's Defendant 0700 Account to his 5100 Account, in transfers of $150,000 and $450,000.  Each transfer included more than $10,000 in fraud proceeds.

91.     Then in and around August 6 and 10, 2018, $600,000 was paid to Newton in check payments of $150,000 and $450,000 respectively from Muiruri's 5100 Account, which were then deposited to Newton's personal BOA 9723 Account.  On or about August 20, 2018, $347,074.21 was wired from Newton's personal BOA 9723 Account to the IOLTA account of Holler Law Firm.  Records supplied by the Holler Law Firm confirm that this payment was used to purchase 12 Mountain View Drive, and the property was deeded to Newton.

### d.  the real property located at 18-20 Middle Street in Dracut, Massachusetts

92.     In December 2016, Muiruri completed the purchase of 18-20 Middle Street in Dracut, Massachusetts for $375,000.

93.     On or about April 4, 2004, Muiruri opened checking account 5169084–5 (the "Defendant 9084-5 Account") (*see* section kk below) and linked savings account 5169084-1 (the "Defendant 9084-1 Account") (*see* section jj below).  Muiruri is the signor on both accounts.

94.     On or about February 10, 2015, Muiruri transferred by check $50,000 from his personal BOA 6118 Account to the Defendant 9084-1 Account.  This transfer included more than $10,000 of fraud proceeds.  Then on June 26, 2015 Newton paid Muiruri $27,000 by check from her personal BOA 9723 Account, which was deposited into the Defendant 9084-1 Account.  This transfer also included more than $10,000 of fraud proceeds.

95.     Between June 26, 2015 and September 21, 2016, the balance in the Defendant 9084-1 Account was never less than $72,000.  On or about September 21, 2016, Muiruri transferred $30,000 from the Defendant 9084-1 Account to the Defendant 9084-5 Account.  This transfer included more than $10,000 of fraud proceeds.

96.     Then, on or about October 3, 2016, Muiruri paid Remax Insight $3,000 by check from the Defendant 9084-5 Account.  On or about October 21, 2016, Muiruri paid Remax Insight $10,000 by check from the Defendant 9084-5 Account.

97.     On or about December 5, 2016, Muiruri withdrew $89,947.68 from his personal BOA 6118 Savings Account to purchase Cashier's Check 1652506502 Payable to the Duffy Law Group.  This purchase included more than $10,000 of fraud proceeds.  Each of the above-described payments, $3,000, $10,000 and $89,947.68 were deposits and payments for the purchase of 18-20 Middle Street in Dracut and were traceable to property involved in money laundering and fraud proceeds.

### e.  the real property located at 3 Courthouse Lane, Units 12, Chelmsford, Massachusetts

98.     On or about June 19, 2015, Muiruri purchased an office condo located at 3 Courthouse Lane, Unit 12, in Chelmsford, Massachusetts for $123,000 and used more than $10,000 of fraud proceeds to do so.

99.     On or about June 10, 2015, Muiruri and Newton signed a Standard Purchase and Sales Agreement to purchase the real property.  On or about that same date, they paid $4,000 to Attorney Robert Wyman, with a check from Arbor BOA Account 7768.

100.     Then, on or about June 19, 2015, Muiruri signed the Settlement Statement (HUD-1) to complete the purchase, listing the buyer as Benjamin Njorogeh Muiruri, Member/Manager of Arbor Homecare Services LLC.  Including closing costs, Muiruri paid $121,761.99 with a check drawn on Arbor BOA Account 7768, and which included more than $10,000 of fraud proceeds.

   **f.  American Equity Investment Life Insurance Annuity account number 1107785, with a purchase price of $500,000, held in the name of Faith Newton**

101.     On or about April 2, 2015, Newton purchased a Life Insurance Annuity from American Equity Life Insurance Co. with an investment of $500,000.  This purchase involved more than $10,000 in fraud proceeds

102.     On or about March 23, 2015, Arbor received a payment from MassHealth into the Arbor BOA 7768 Account, which included fraud proceeds of at least $598,037.90.  In or around the same day, $500,000 was transferred from Arbor BOA 7768 Account to Arbor BOA Account 5931.  On or about April 6, 2015, $565,000 was transferred from the 5931 Account to Newton's personal BOA 9723 Account.  This transfer included more than $10,000 of fraud proceeds.

103.     On or about April 2, 2015, Newton completed an individual annuity application in her name with American Equity Life Insurance Co. and purchased a Bonus Gold Annuity, Account 1107785, in the amount of $500,000.  Newton purchased the annuity with a check drawn on her personal BOA 9723 Account.

> **g.  all funds on deposit in Charles Schwab 529 Plan account number 718188648-01, held in the name of Faith Newton FBO [Minor Child 1]**

104.     Between January 1, 2014 and October 30, 2017, payments in excess of $280,000 were made directly from the Arbor BOA Account 7768 to fund two Individual 529 Plan accounts at Charles Schwab.  The funding of these accounts involved traceable fraud proceeds.

105.     In or around July 25, 2007, Newton opened an Individual 529 Account 71818864801 (the "Defendant 4801 Account") at Charles Schwab in the name Faith Newton, FBO, [Minor Child 1].  On January 1, 2014, the balance in Defendant 4801 Account was $12,984.40.  Between January 1, 2014 and October 31, 2017, there were regular monthly payments made to Defendant 4801 Account from the Arbor BOA Account 7768.  During this time period, approximately $102,200 was deposited into Defendant 4801 Account from Arbor.

> **h.  all funds on deposit in Charles Schwab 529 Plan account 715255386-01 in the name of Benjamin Muiruri, FBO [Minor Child 2]**

106.     In or around January 16, 2006, Muiruri opened an Individual 529 Account 71525538601 (the "Defendant 8601 Account") at Charles Schwab in the name Benjamin Muiruri, FBO [Minor Child 2].  On January 1, 2014, the balance in Defendant 8601 Account was $10,059.06.  Between January 1, 2014 and October 31, 2017, there were regular monthly payments made to Defendant 8601 Account from the Arbor BOA Account 7768.  During this time period, approximately $178,200 was deposited into Defendant 8601 Account.  The funding of these accounts involved traceable fraud proceeds.

> **i.  all funds on deposit in at Digital Federal Credit Union account number 5153823-5 held in the name of Faith Newton**

107.     In or around October 15, 2003, Newton opened two accounts at Digital Federal Credit Union, Savings Account 5153823-1 (the "Defendant 3823-1 Account") and Checking Account 5153823-5 (the "Defendant 3823-5 Account").  In approximately March 2017, Newton also opened another savings account 5153823-2 (the "Defendant 3823-2 Account").

108.     In sum, Newton used more than $10,000 of fraud proceeds to purchase a Maserati sports car, which she later sold and deposited the net proceeds of that sale into the Defendant 3823-5 Account.

109.     Between approximately June 20, 2016 through August 29, 2016 Arbor received approximately $8,457,637 in fraud proceeds from MassHealth into the Arbor BOA Account 7768.  On or around July 12, 2016 there were three transfers of $999,999.99 each from the Arbor BOA Account 7768 into the Arbor BOA Account 5931.  Then on or about August 8 and 29, 2016, there were two more transfers in the amount of $999,999.99 each.  Between August 29, 2016 and January 12, 2017, the balance in Arbor BOA Account 5931 was always more than $5,958,704.34.

110.     On or around September 15, 2016, $2,000,000 was wired from the Arbor 7768 Account to Newton's Personal BOA 9723 Account.  On or about October 3, 2016, Newton purchased a 2013 Maserati Granturismo bearing Vehicle Identification Number ZAM45VMA0D0072451.  Newton paid the seller, who also sold the Defendant Real Property at 440 Great Pond Road (described in section b above) to Newton, in three payments totaling $90,000.  These three payments also included $10,000 towards the purchase of fountains located at that Defendant Real Property.  The three checks were in the amounts of $10,000, $30,000 and $50,000 respectively and were paid from Newton's Personal BOA 9723 Account.  For example, the following is an image of the check for $50,000 with Memo line stating "Balance on Maserati":

111.    Then, on or about August 19, 2020, Newton sold the 2013 Maserati to Harr Motor

Company for $49,000.  Newton received a check from Harr Motor Company and deposited that

check into the Defendant 5153823-5 Account.

112.    On or about August 31, 2015, Newton purchased a business condominium at 3

Courthouse Lane, Unit 4 in Chelmsford, Massachusetts for $90,000.  The purchase of this real

property involved more than $10,000 in fraud proceeds.

113.    On or about August 15, 2015, Newton signed a purchase and sale agreement to

purchase the business condominium at 3 Courthouse Lane, Unit 4 in Chelmsford.  On or about

August 24, 2015, Arbor received at least approximately $703,763.10 in fraud proceeds from

MassHealth into Arbor BOA Account 7768.  Then, on or about August 31, 2015 check 1561

from the Arbor BOA Account 7768, was paid to Attorney John K Leslie in the amount of

$90,200.

114.    On or about September 19, 2020, Newton signed a Standard Form Condominium

Purchase and Sale Agreement where she agreed to sell 3 Courthouse Lane, Unit 4, in Chelmsford

for $99,900.00.  A Settlement Statement dated October 30, 2020 documents the completed sale.

After closing costs and real estate fees, Newton received approximately $71,381.95 via a check

from the closing attorney.  On or about November 7, 2020, Newton deposited the $71,381.95 into the Defendant Digital Credit Union 3823-5 Account.  These funds involved more than $10,000 in fraud proceeds.

### j.   all funds on deposit in Digital Federal Credit Union savings account number 5153823-1 held in the name of Faith Newton

115.    On or about January 12, 2017, $4,000,000 was transferred from the Arbor BOA Account 5931 to the Arbor BOA Account 7700, then $2,000,000 was transferred from the Arbor BOA Account 7700 to Newton's Personal BOA 9723 Account.  This transfer contained more than $10,000 in fraud proceeds.  Between January 12, 2017 and March 20, 2017, the balance in the 9723 Account was never less than $1,000,000.

116.    On or about March 20, 2017, Newton transferred $50,000 by check from her personal BOA 9723 Account to the Defendant 3823-1 Account.

### k.   all funds on deposit in Digital Federal Credit Union savings account number 5153823-2 held in the name of Faith Newton

117.    In and around November 2017 and January 2018, Newton purchased 18 & 20 Mill Street in Dracut, Massachusetts.  Both properties are part of the same condominium trust, but purchased separately.  The purchase of this real property involved more than $10,000 in fraud proceeds

118.    In or around October 26, 2016, $2,100,000 was transferred from the Arbor BOA Account 5931 to Newton's Personal BOA 9723 Savings Account.  This transfer included more than $10,000 of fraud proceeds.  Between October 26, 2016 and December 28, 2017, the balance of Newton's Personal BOA 9723 Savings Account was always greater than $2,900,000.

119.    On or about February 7, 2017, Eleanor Connors ("Connors") opened a bank account at Enterprise Bank, account 881902 (the "1902 Account") in the name of Manor Realty Trust.  As described in paragraph 82 above, Newton is the sole beneficiary of the Manor Realty

Trust.  On or about May 11, 2017, Connors opened another account in the name of Manor Realty Trust, account 896324 (the "6324 Account").

120.    In or around October 26, 2017 Newton transferred $100,000 by check from her personal BOA 9723 Account to the Defendant 6324 Account.  On or about November 7, 2017, $3,375.00 was paid from the Defendant 6324 Account to Elite Title and Closing Service LLC ("Elite Title").  On or about November 30, 2017, $116,069.01 was wired from Newton's Personal BOA 9723 Savings Account to Elite Title.  Records obtained from Elite Title confirm that both payments were for the purchase of 20 Mill Street in Dracut for $112,500.00 plus closing costs.

121.    On or about November 28, 2017, Newton withdrew funds from her personal BOA 9723 Account to purchase a cashier's check for $5,000.00 payable to Newton, which was endorsed and paid to Harmon Law Offices, PC.  Then on or about December 28, 2017, $162,000 was withdrawn from Newton's personal BOA 9723 Savings Account to purchase cashier's check 1442606924, which was payable to Harmon Law Offices, PC.  Records obtained from the Harmon Law Offices, PC confirm that on or about January 5, 2018 Newton closed the purchase of 18 Mill St, Unit 18, in Dracut, Massachusetts at Auction for $167,000.

122.    Then, on or about April 12, 2019, Newton sold 18-20 Mill St, Unit 20  for $243,000.00 resulting in net proceeds of $212,111.19.  Newton received the net proceeds from Eliopoulos & Eliopoulos PC, the law firm that handled the closing and Newton deposited the net proceeds into the 3823-2 Account at Digital Federal Credit Union.  This deposit included more than $10,000 traceable to fraud proceeds.

123.    On or about April 16, 2019, Newton sold 18-20 Mill St, Unit 18 for $243,000. The proceeds of the sale after closing costs was $223,205.69, which was paid to Newton by Harrington Buck PC, the law firm that handled that closing.  Newton deposited the funds into the

Defendant 3823-2 Account at Digital Federal Credit Union.  This deposit included more than

$10,000 traceable to fraud proceeds.

      **l.   all funds on deposit in Northern Bank & Trust Company account number 7908774400 held in the name of Careplus Medical Transport LLC**

124.    On or about July 16, 2014, Newton organized Careplus Medical Transport LLC.

Newton is listed as the sole Managing Member.  On or about March 22, 2017, Newton opened

account 7908774400 (the "Defendant Account 4400") in the name of Careplus Medical

Transport LLC at Northern Bank & Trust Company and is the only signer on the Defendant 4400

Account.

125.    As previously noted, Newton received approximately $18,196,000 in direct

payments from Arbor into her personal BOA 9723 and personal BOA 9723 Savings Account,

with more than 60% of these funds derived from the fraud, between January 1, 2014 and July 31,

2017.  On and around March 30, 2017 and April 13, 2017, Newton made two payments of

$1,000,000 each from her personal BOA 9723 Account to the Defendant 4400 Account.  The

balance in the Defendant 4400 Account on April 13, 2017 was over $2,000,000, and between

April 13, 2017 and August 31, 2020 Newton made transfers out of the 4400 Account discussed

below.

      **m. all funds on deposit in Northern Bank & Trust Company account number 8084857500 held in the name of Faith Newton, Trustee in Trust for [Minor Child 2], Beneficiary, [Minor Child 1], Beneficiary**

126.    On or about December 3, 2019, Newton opened Account 8084857500 (the

"Defendant 7500 Account"), titled Faith Newton Trustee, in Trust for [Minor Child 1],

Beneficiary, [Minor Child 2], Beneficiary.  On or about December 3, 2019, Newton transferred

$1,068,650.70 from the Defendant 4400 Account to the Defendant 7500 Account.  On or about

December 3, 2019, Newton transferred $1,931,349.30 from Defendant 9700 Account (see

section n immediately below) to the Defendant 7500 Account.  Each transaction involved more than $10,000 of fraud proceeds.

>    **n. all funds on deposit in Northern Bank & Trust Company account number 8085909700 held in the name of Faith Newton**

127.    On or about March 26, 2018, Newton opened Account 8085909700 (the "Defendant 9700 Account") in her name.  In or around March 27, 2018 Newton transferred $20,000 by check to the Defendant 9700 Account from her personal BOA 9723 Account.  On or about March 28, 2018, Newton transferred $2,000,000 by check to the Defendant 9700 Account from her personal BOA 9723 Account.  Each transaction involved more than $10,000 of fraud proceeds.  On or about December 3, 2020, $680,000 was transferred from the Defendant 7500 Account to the Defendant 9700 Account.

>    **o. all funds on deposit in Citizens Bank account number 1338331946 held in the name of Faith Newton**

128.    On or about June 19, 2018, Newton opened two bank accounts at Citizens Bank in her name, a Checking Account 1338331946 (the "Defendant 1946 Account") and a Money Market Account 1338331997 (the "Defendant 1997 Account").  Newton deposited $500 into each account with a $1,000 check drawn on her personal BOA 9723 Account.

129.    On or about January 29, 2019, Newton deposited Cashier's Check 1442608827 into her new accounts at Citizens Bank.  Of the funds in the Cashier's Check, $20,000 was credited to the 1946 Account and $70,371.62 was credited into the 1997 Account.

130.    The contents of Cashier's Check 1442608827 included more than $10,000 of fraud proceeds and funds traceable to fraud proceeds.  The cashier's check was purchased on or about January 2, 2019, with the closing of another of Newton's accounts at Bank of America, in the name Careplus Homehealth Inc., which was itself funded with more than $10,000 of proceeds of the fraud described herein.

28

    **p.  all funds on deposit in Citizens Bank savings account number 1338331997 held in the name of Faith Newton**

131.     As described above, on or about June 19, 2018, Newton opened two bank accounts at Citizens Bank in her name, the Defendant 1946 Account and the Defendant 1997 On or about January 29, 2019, $70,371.62 was credited into the 1997 Account from Cashier's Check 1442608827.  On or about January 8, 2020, $1,037,777.31 was transferred to the Defendant 1997 Account from an 18 Month Certificate of Deposit at Citizens Bank, itself funded with more than $10,000 of proceeds of the fraud described herein.

    **q.  all funds on deposit in Citizens Bank investment account number N6M-329427 held in the name of Faith Newton**

132.     On or about February 14, 2020, Newton opened Brokerage Account N6M-329427 (the "Defendant 9427 Account") at Citizens Bank.  On or about February 19, 2020, Newton transferred $800,000 from the Defendant 1997 Account, described in section p above, to the newly opened Defendant 9427 Account.  This transfer involved more than $10,000 traceable to fraud proceeds.  Since the Defendant 9427 Account was opened no other deposits or withdrawals have been made in the account.

    **r.  all funds on deposit in Citizens Bank account number 1338848825 held in the name of Careplus Medical Transport LLC**

133.     On or about January 28, 2019, Newton opened three bank accounts at Citizens Bank in the name of Careplus Medical Transport LLC, account  1338848795 (the "Defendant 8795 Account"), account  1338848728 (the "Defendant 8728 Account"), and account 1338848825 (the "Defendant 8825 Account").  Newton is the only signer listed for all three accounts.

134.     On or about January 28, 2019, Newton closed her personal BOA 9723 Savings Account, which contained fraud proceeds, and purchased a Cashier's Check for $22,867.63, which was deposited into the three newly opened Careplus Medical Transport LLC accounts at

Citizens Bank.  Of the funds included in the cashier's check, $5,000.00 was credited to the Defendant 8728 Account, $10,000 was credited to the Defendant 8795 Account and $7,867.63 was credited to the Defendant 8825 Account.

> **s.   all funds on deposit in Citizens Bank account number 1338848795 held in the name of Careplus Medical Transport LLC**

135.    As described in section r, above, Newton opened Defendant Account 8795 on or about January 28, 2019 when $10,000 was credited to this account.  On or about February 13, 2019, Newton deposited Cashier's Check 1442608891 for $16,897.70 into the Defendant 8795 Account.  Cashier's Check 1442608891, which included more than $10,000 of fraud proceeds, was purchased with funds from another of Newton's accounts at Bank of America, in the name Careplus Medical Transport LLC, which was itself funded with more than $10,000 of fraud proceeds.

> **t.   all funds on deposit in Citizens Bank account number 133884-872-8 held in the name of Careplus Medical Transport LLC**

136.    As described in section r above, Newton opened Defendant 8728 Account on or about January 28, 2019 using $5,000 of a $22,867.63 cashier's check containing more than $10,000 of fraud proceeds.

> **u.   all funds on deposit in Citizens Bank checking account number 133884-869-8 held in the name of Golden Living Homecare Inc.**

137.    On or about July 27, 2018, Newton and Connors purchased Medicol Inc. for $350,000 from Rose Tabe and George O.  Akinkuoye.  A corporate amendment filed with the Massachusetts Secretary of State appointed Newton as the new president and registered agent for Medicol Inc.  On or about August 14, 2018, another amendment filed with the Massachusetts Secretary of State changed the name of Medicol to Golden Living Homecare Inc.

138.    On or about January 28, 2019, Newton opened a bank account at Citizens Bank in the name of Golden Living Home Care Inc, 1338848698 (the "Defendant 8698 Account"). Newton is the only signer listed on the account.

139.    On or about July 12, 2019, $100,000 was transferred from the Defendant 1997 Account, described in section p above, to the Defendant 8698 Account.  As described above, the contents of the Defendant 8698 Account were themselves traceable to proceeds of the fraud and the July 12, 2019 deposit also included more than $10,000 of fraud proceeds.

> **v.  all funds on deposit in Citizens Bank investment account number N6M-329852 at in the name of Faith Newton Custodian [Minor Child 1] UTMA**

140.    On or about April 9, 2019, Newton opened two Citizens Bank Investment Brokerage Accounts, Account N6M-329852 (the "Defendant 9852 Account"), and Account N9M-051584 (the "Defendant 1584 Account").  Each of these accounts are named Faith N. Newton, Cust for [Minor Child 1] UTMA.

141.    On or about April 10, 2019, $100,000 was transferred from the 6227 Account to the Defendant 9852 Account as the initial deposit into the account.  The funds used to fund Defendant 9852 Account were traceable to fraud proceeds from an Arbor BOA Account used to purchase real property in Lowell, Massachusetts, as well as fraud proceeds that were paid to two bank accounts in the name of Minor Child 1.  In January 2016, that Lowell property was purchased using more than $10,000 of traceable fraud proceeds.  In April 2017, the Lowell property was sold and the net proceeds of the sale, as well as a subsequent payment on a loan Newton extended the buyer, were deposited into an account that was later liquidated and its contents ultimately used to fund this Defendant Account.  The Minor Child 1 bank accounts were funded with payments from an Arbor BOA account and Newton's 9723 Account using more than $10,000 of traceable fraud proceeds.

**w. all funds on deposit in Citizens Bank investment account number N9M-051584 held in the name of Faith Newton Custodian [Minor Child 1] UTMA**

142.     As described in section v above, on or about April 9, 2019, Newton opened Defendant 1584 Account.  On or about April 11, 2019, $100,000 was transferred to the Defendant 1584 Account as the initial deposit into the account.  These funds were also traceable fraud proceeds and property involved in money laundering in the same manner as the funds described in paragraph 141 immediately above.

**x. all funds on deposit in Citizens Bank account 1339358724, held in the name of the Newton Family Trust**

143.     In or around March 22, 2019 Newton opened Account 1339358724 (the "Defendant 8724 Account") at Citizens Bank in the name Newton Family Living Trust UTD 12/29/2014, Faith Newton, Trustee, Benjamin Muiruri Trustee.  The opening deposit to the Defendant 8724 account was Cashier's Check 220001328 in the amount of $403,346.01 from an Align Credit Union account, itself funded with more than $10,000 in fraud proceeds.  The Align Credit Union account was opened on or about December 9, 2014 with a $200,000 from an Arbor BOA Account and another $200,000 traceable to Arbor proceeds was later deposited in the account.

**y. Security Benefit Life Insurance Company, fixed annuity contract number 9450014217, held in the name of the Newton Family Trust**

144.     On or about March 25, 2019, Newton and Muiruri opened Investment Account N6M329751 (the "9751 Account") in the name Newton Family Trust, with Newton and Muiruri listed as the Trustees and only signers on the account.  The opening of the 9751 Account also included the application to purchase two annuities through the account, the Defendant 4217 Account and Defendant 2754 Account.

145.     On or about April 10, 2019, $100,000 was transferred from the 8724 Account, described in paragraph 143, to the 9751 Account to fund a $100,000 Fixed Annuity Contract, Defendant 4217, which was purchased from Security Benefit Life Insurance Company.

### z.   Forethought Life Insurance Company, Index Annuity contract 7380012754, held in the name of the Newton Family Trust

146.     On or about April 3, 2019, $300,000 was transferred from the 8724 Account, described in paragraph 143, to the 9751 Account to fund a $300,000 Indexed Annuity Contract, Defendant 2754, which was purchased from Forethought Life Insurance Company.

### aa. all funds on deposit in Citizens Bank account number N6M-329958, held in the name of [Minor Child 2]

147.     On or about April 19, 2019, [Minor Child 2] opened two investment brokerage accounts at Citizens Bank, account N6M329958 (the "Defendant 9958 Account") and account N9M051641 (the "Defendant 1641 Account").  On or about April 22, 2019, the Defendant 9958 Account was funded with $100,000 from another account which was itself previously funded with funds traceable to Newton's personal 9723 BOA Account and an Arbor BOA Account, including more than $10,000 of fraud proceeds.  Since the initial investment of $100,000 there have been no other deposits or withdrawals.

### bb. all funds on deposit in Citizens Bank account number N9M-051641, held in the name of [Minor Child 2]

148.     On or about April 22, 2019, the Defendant 1641 Account was funded with $100,000 from another account which was itself previously funded with funds traceable to Newton's personal 9723 BOA Account and an Arbor BOA Account, including more than $10,000 of fraud proceeds.  Since the initial investment of $100,000 there have been no other deposits or withdrawals.

### cc. all funds on deposit in Equitrust Life Insurance account number EQ0001230812F, held in the name of Ben Muiruri

149.     On or about April 2, 2015, Muiruri purchased Market 12 Bonus Index Annuity

Contract EQ0001230812F from Equitrust Life Insurance Company (the "Defendant Equitrust

Account"), with an initial premium of $250,000.  The Defendant Equitrust Account was

purchased with a $250,000 check from Muiruri's Personal BOA 6118 Account, which included

more than $10,000 of fraud proceeds.

### dd. all funds on deposit in Fidelity & Guaranty Life account number L9297768, held in the name of Ben Muiruri

150.     On or about April 2, 2015, Muiruri also purchased a $250,000 Performance Pro

Annuity Contract L9297768 from Fidelity Guaranty Life Insurance Company (the "Defendant

Performance Pro Contract").  The Defendant Performance Pro Contract was also purchased with

a $250,000 check from Muiruri's Personal BOA 6118 Account, which included more than

$10,000 of fraud proceeds.

### ee. all funds on deposit in Discover Bank account number 7004842391, held in the name of Ben Muiruri

151.     On or about January 20, 2016, Muiruri opened Online Savings account

7004842391 (the "Defendant 2391 Account") at Discover Bank in his name.  To open the

account, he made a $50,000 transfer from his personal BOA 6118 Account, and the transfer

included more than $10,000 of fraud proceeds.  After the initial deposit of $50,000, Muiruri

made weekly transfers of $2,000 from his personal BOA 6118 Account to the Defendant 2391

Account, totaling $70,000.  Since the opening of the Defendant 2391 Account the only other

deposits have been regular monthly deposits of interest.  The only withdrawal was a $10,000

wire transfer to Muiruri's DCU 9084-5 Account (Defendant 9084-5 Account, *see* Section kk

below).

**ff.  all funds on deposit in American Express High Yield account number 320002652333, held in the name of Ben Muiruri**

152.    On or about May 16, 2016, Muiruri opened High Yield Savings Account 320002652333 (the "Defendant 2333 Account") with American Express.  Muiruri is the only signer on the account.  The Defendant 2333 Account was funded on the same day with a $100,000 transfer from his personal BOA 6118 Account, and the transfer included more than $10,000 of fraud proceeds.

**gg. all funds on deposit in American Equity Investment Life Insurance account number 1220173, held in the name of the BNM Family Irrevocable Trust**

153.    In or around October 25, 2016, Muiruri purchased Annuity Contract 1220173, from American Equity Investment Life Insurance Company, in the name of the BNM Family Irrevocable Trust.  Muiruri paid $200,000 by check from his personal BOA 6118 Account, which included more than $10,000 in fraud proceeds.  In or around October 18, 2017, Muiruri paid another $200,000, by a cashier's check, to increase the value of Contract 1220173.  The $200,000 was drawn on his Defendant 9084-1 Account, described in section jj below, and included more than $10,000 of fraud proceeds.  Muiruri is the only beneficiary on the contract.

**hh. all funds on deposit in Equitrust Life Insurance, account number EQ0001294887L held in the name of the BNM Family Irrevocable Trust**

154.    On or about October 27, 2017, Muiruri applied for a Wealthmax Bonus Life Insurance policy from Equitrust Life Insurance Policy, Policy EQ0001294887L, with a premium of $300,000.

155.    On or about January 12, 2018, Muiruri wrote a check for $300,000 to Equitrust Life Co., which paid for Policy EQ0001294887L.  The $300,000 check was drawn on his Defendant 9084-5 Account, described in section kkbelow, and included more than $10,000 of fraud proceeds.

**ii.  all funds on deposit in Santander Bank account number 3572360951, held in the name of the BNM Family Irrevocable Trust**

156.    On or about November 28, 2016, Peninnah Muiruri, as Trustee, opened checking account 3572360951 (the "Defendant 0951 Account") at Santander Bank, titled BNM Family Irrevocable Trust, with an opening deposit of $50,000.  The $50,000, a check, was drawn on Muiruri's Personal BOA 6118 Account and included more than $10,000 of fraud proceeds. Since that deposit, the only transactions in the account have been small monthly bank fee withdrawals.

**jj.  all funds on deposit in Digital Federal Credit Union account number 5169084-1, held in the name of Ben Muiruri**

157.   On or about February 10, 2015, Muiruri transferred $50,000 by check from his Personal BOA 6118 Account to the Defendant 9084-1 Account, which included more than $10,000 of fraud proceeds.  Then on or about June 26, 2015, Newton paid Muiruri $27,000 by check from her Personal BOA 9723 Account, which included more than $10,000 of fraud proceeds and was also deposited into the Defendant 9084-1 Account.

158.    On September 21, 2016 Muiruri transferred $30,000 from the 9084-1 Account to the 9084-5 Account.

159.    On or about September 5, 2017, Muiruri transferred $600,000 by check from his personal BOA 6118 Account to the Defendant 9084-1 Account.  This transfer included more than $10,000 of fraud proceeds.  Of the $600,000, Muiruri used $500,000 to purchase an annuity and a life insurance policy, as explained in Sections gg and ff above.  After these purchases, $100,000 remained in the account.  During this same time period, $71,950 was transferred from the Defendant 9084-1 Account to the Defendant 9084-5 Account.

**kk. all funds on deposit in Digital Federal Credit Union account number 5169084-5, held in the name of Ben Muiruri**

160.     On or about September 21, 2016, Muiruri transferred $30,000 from the Defendant 9084-1 Account to the Defendant 9081-5 Account.  The transfer included more than $10,000 of fraud proceeds.  On or about September 10, 2019, Muiruri transferred by wire $10,000 from the Defendant 2391 Account, described in Section ee above, to the Defendant 9084-5 Account.  This transfer included traceable fraud proceeds.

161.     In addition, on or about January 12, 2018, Muiruri transferred $300,000 from the Defendant 9084-1 Account to the Defendant 9084-5 Account.  This transfer included more than $10,000 of fraud proceeds.  After these funds arrived in the Defendant 9084-5 Account, they were used to purchase the Defendant Equitrust Life Co.  policy described in section hh above.

162.     Between January 13, 2018 and September 2020, the balance in the 9084-5 Account was always positive.  During this same time period, there were transfers from the 9084-1 Account to the 9084-5 Account that totaled $71,950.

**ll. all funds on deposit in Jeanne D'Arc Credit Union account number 9999953731, held in the name of Ben Muiruri**

163.     On or about May 4, 2011, Muiruri opened Money Market Savings account 9999953731 (the "Defendant 3731 Account") at Jeanne D'Arc Credit Union.  Muiruri is the only signer listed on the account.  There was minimal activity in the account prior to 2015.

164.     On or about January 31, 2015, the balance in the Defendant 3731 Account was $4,124.78.  On or about February 10, 2015, Muiruri deposited $50,000 into the Defendant 3731 Account by check, paid from his Personal BOA 6118 Account, and which included more than $10,000 of fraud proceeds.

165.     On or about May 5, 2015, Muiruri transferred $10,000 from his personal BOA 6118 Account to the Defendant 3731 Account.  These were the only two deposits to the

Defendant 3731 Account, except for monthly deposits of earned interest, and the only withdrawals were $4,000 and $5,000 cash withdrawals in 2015 and 2016.  On or about November 30, 2020, the balance in the Defendant 3731 Account was $57,109.62, traceable to two transfers, one in excess of $10,000, of fraud proceeds from Muiruri's personal BOA 6118 Account.

> ### mm.  all funds on deposit in Northern Bank and Trust Company account number 6527860700, held in the of name Ben Muiruri

166.    On or about March 26, 2018, Muiruri opened two bank accounts at Northern Bank and Trust Company, a Money Market Account 6527860700 (the "Defendant 0700 Account") and Checking Account 7689065100 (the "5100 Account").  On that same date, Muiruri transferred $1,961,058.35 from his Personal BOA 6118 Savings Account to his Personal BOA 6118 Account.  This transfer included more than $10,000 of fraud proceeds.  On March 27, 2018, Muiruri made an initial deposit of $1,950,000 into the Defendant 0700 Account through a check drawn on his Personal BOA 6118 Account.  This transaction included more than $10,000 of fraud proceeds.

167.    It should be noted that the 5100 Account has a minimal balance remaining and is, therefore, not included as a Defendant Account.

168.    Between March 27, 2018 and November 30, 2020, Muiruri made frequent transfers to the 5100 Account and wired funds to third parties outside of the United States, in Kenya.[5]

---

5 Between Newton and Muiruri, approximately $13,035,282.37 was transmitted from the United States to Kenya.  That money has not been recovered.

**nn. all funds on deposit in Citizens Bank account number 1338844854,
held in the name of Ben Muiruri**

169.    On or about June 13, 2018, Muiruri opened Money Market Account 1338844854 (the "Defendant 4854 Account") at Citizens Bank.  He is the only signer listed on the account.

170.    As described above, on or about March 27, 2018, Muiruri transferred $1,950,000.00 from his Personal BOA 6118 Account to open the Defendant 0700 Account at Northern Bank and Trust Company.  On or about June 20, 2018, Muiruri transferred $800,000 from the Defendant 0700 Account to his 5100 Account.  Then on or about June 26, 2018, Muiruri made a deposit of $180,000 by check drawn on the 5100 Account into the Defendant 4854 Account.

171.    On or about June 28, 2018, Muiruri transferred $150,000 from the Defendant 4854 Account into another account held by Muiruri at Citizens Bank, account N9M-050552 (the "0552 Account").

**oo. all funds on deposit in Citizens Bank account number N9M-050553,
held in the name of Ben Muiruri**

172.    On or about June 19, 2018, Muiruri opened three Citizen's Advisory Solutions Investment accounts at Citizens Bank, Account N9M050552 (the "0552 Account"), Account N9M050553 (the "Defendant 0553 Account") and Account N9M050554 (the "Defendant 0554 Account").  Muiruri is the only signer for each of these accounts.

173.    It should be noted that the 0552 Account has a minimal balance remaining and is, therefore, not included as a Defendant Account.

174.    On or about June 27, 2018, Muiruri transferred the entire holdings of an account he then held at TD Ameritrade to the 0552 Account, which was valued at approximately $432,604.45.  The transfer included more than $10,000 of fraud proceeds.

175.    On or about June 28, 2018, Muiruri transferred $150,000 from the Defendant 4854 Account, described in Section nn above, into the 0552 Account.  Then, on or about July 10, 2018, Muiruri transferred the entire balance of the 0552 Account, except approximately $411.47, to the Defendant 0553 and 0554 Accounts, which included equity investments and approximately $126,233.70 in cash, to the Defendant 0553 Account.  The value of the transfer to Defendant 0553 Account was approximately $433,020.52 and included more than $10,000 of fraud proceeds.

176.    On or about October 10, 2018, another TD Ameritrade account was transferred to the Defendant 0553 Account, a value of cash and investments of approximately $136,620.86, and this transfer also included more than $10,000 of fraud proceeds.

### pp. all funds on deposit in Citizens Bank account number N9M-050554, held in the name of Ben Muiruri

177.    On or about June 19, 2018, Muiruri opened the Defendant 0554 Account at Citizens Bank and is the only signer on the account.  On or about July 10, 2018, $149,584.84 was transferred from the 0052 Account to the Defendant 0554 Account, and the transfer included more than $10,000 of fraud proceeds.  .

### qq. all funds on deposit in Northern Bank and Trust Company account number 8137210800, held in the name of Arbor Homecare

178.    On or about November 3, 2017, Muiruri opened two accounts in Arbor's name at Northern Bank & Trust Company, Business Express Checking Account 4763346802 (the "Defendant 6802 Account") and Business Money Market Account 8137210800 (the "Defendant 0800 Account").  On or about October 24, 2017, the three Arbor BOA Accounts were closed, and the funds were used to purchase cashier's checks:

| Arbor BOA Account | Amount | Cashier's Check Number |
|---|---|---|
| 7700 | $110,779.76 | 1019325169 |
| 7768 | $86,629.50 | 1019325153 |
| 5931 | $2,244,335.93 | 1019325168 |

179.    On or about November 3, 2017, the checks containing the funds from the Arbor BOA Accounts were deposited into the Defendant 0800 Account, each check containing more than $10,000 in fraud proceeds.  Since that initial deposit, the only other transactions in the Defendant 0800 Account has been monthly deposits of earned interest and transfers out of the Defendant 0800 Account to the Defendant 6802 Account.  Between December 13, 2017 and November 30, 2020, several account transfers were made from this Defendant Account to Defendant 6802 Account.

### rr. all funds on deposit in Northern Bank and Trust Company account number 4763346802, held in the name of Arbor Homecare

180.    As described above, on or about November 3, 2017, the checks containing the funds from the Arbor BOA Accounts were deposited into the Defendant 0800 Account.  On or about December 13, 2017, $20,000 was transferred from the Defendant 0800 Account to the Defendant 6802 Account, and the transfer included more than $10,000 of fraud proceeds. Between that date and November 30, 2020, there were additional transfers from the Defendant 0800 Account into the Defendant 6802 Account that totaled approximately $816,636.63.  The only other deposit into the account was for $100.53.

### ss. all funds on deposit in Align Credit Union account number 76382-1, held in the name of Arbor Homecare

181.    On or about April 27, 2012, Muiruri opened a savings account in Arbor's name at Align Credit Union,  Account 76382-1 (the "Defendant 6382-1 Account").  On or about September 23, 2014 $100,000 was paid from an Arbor BOA Account by check to the Defendant

6382-1 Account, which contained more than $10,000 in fraud proceeds. Another $105,190.12 was deposited in 2016 and 2018, which is traceable to Arbor fraud proceeds.

## IV.   FIRST CLAIM FOR FORFEITURE

182.    The allegations contained in paragraphs 7 through 181 are incorporated herein.

183.    Pursuant to 18 U.S.C. § 981(a)(1)(C), "any property, real or personal, which constitutes or is derived from proceeds traceable," to a violation of "specified unlawful activity" is subject to forfeiture to the United States. 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud), and 18 U.S.C. § 371 (Conspiracy to Defraud the United States (Related to a Healthcare Benefit Program)). Each of these offenses is a "Federal healthcare offense," pursuant to 18 U.S.C. § 24(a). In addition, each of these offenses is a "specified unlawful activity" because each is "any act or activity constituting an offense involving a Federal health care offense." *See* 18 U.S.C. § 1956(c)(7)(F).

184.    The Defendants *in rem* constitute "any property, real or personal, which constitutes or is derived from proceeds traceable," to a violation of "specified unlawful activity", specifically, 18 U.S.C. § 1347 (Health Care Fraud), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud), and 18 U.S.C. § 371 (Conspiracy to Defraud the United States (Related to a Healthcare Benefit Program)), and 42 U.S.C. § 1320a-7(b) (Offer and Payment of Kickbacks). Each of these offenses is a "Federal healthcare offense," pursuant to 18 U.S.C. § 24(a). In addition, each of these offenses is a "specified unlawful activity" because each is "any act or activity constituting an offense involving a Federal health care offense." See 18 U.S.C. § 1956(c)(7)(F).

185.    The Defendants *in rem* are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because there is probable cause to believe that the Defendants *in rem* constitute "any property, real or personal, which constitutes or is derived from proceeds traceable," to a violation of "specified unlawful activity."

## V.    SECOND CLAIM FOR FORFEITURE

186.    The allegations contained in paragraphs 7 through 181, and 184, are incorporated herein.

187.    The Defendant Properties *in rem* are also subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of [18 U.S.C. §§ 1956 and 1957] or any property traceable to such property."

## VI.    CONCLUSION

WHEREFORE, the United States of America respectfully requests:

1.    That a Warrant and Monition, in the form submitted herewith, be issued to the United States Attorney's Office and the Internal Revenue Service, commanding one or more of them to give notice to all interested parties to appear and show cause why the forfeiture should not be decreed;

2.    That judgment of forfeiture be decreed against the Defendant Properties *in rem*;

3.    That thereafter, the Defendant Properties *in rem* be disposed of according to law; and

4.    For costs and all other relief to which the United States may be entitled.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

Dated: January 28, 2021          By:    */s/ DAVID G. LAZARUS*
                                         DAVID G. LAZARUS
                                         RACHEL Y. HEMANI
                                         Assistant United States Attorneys
                                         United States Attorney's Office
                                         1 Courthouse Way, Suite 9200
                                         Boston, MA 02210
                                         (617) 748-3100
                                         david.lazarus2@usdoj.gov
                                         Rachel.hemani@usdoj.gov

## **VERIFICATION**

I, Elizabeth Keating, deposes and says that I am a Special Agent with the Internal Revenue Service, Criminal Investigations ("IRS-CI"), and as such I have responsibility for the within action; that I have read the foregoing complaint and know the contents thereof; and that the same is true to the best of my own knowledge, information and belief.

The sources of deponent's information and the ground of her belief are official records and files of the IRS-CI, and information and documents obtained and/or reviewed by deponent during an investigation of alleged violations of 18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering), 18 U.S.C. § 1957 (Money Laundering), 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud), 18 U.S.C. § 371 (Conspiracy to Defraud the United States), and other offenses.

Dated: January 28, 2021

Elizabeth Keating
Special Agent
Internal Revenue Service,
Criminal Investigation

Jurat

Suffolk , ss.                    Commonwealth of , Massachusetts

On this 28th day of January, 2021, before me, Elizabeth Keating the undersigned notary public, personally appeared Elizabeth Keating, Special Agent with the Internal Revenue Service, Criminal Investigation, proved to me through satisfactory evidence of identity, which was Credentials , to be the person whose name is signed on the preceding or attached document, and who swore or affirmed to me that the contents of the document are truthful and accurate to the best of his knowledge and belief.

Karen T. Back
Notary Public

My commission expires: July 19, 2024

KAREN T BACK
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
July 19, 2024

44